**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0566-22

IN THE MATTER OF
P.O. STEPHEN MCGEE,
NEW JERSEY TRANSIT POLICE
DEPARTMENT.

_____

Argued September 11, 2024 – Decided October 4, 2024

Before Judges Currier and Marczyk.

On appeal from the New Jersey Transit Police Department, Docket No. 2019-007.

Stuart J. Alterman argued the cause for appellant Stephen McGee (Alterman & Associates, LLC, attorneys; Stuart J. Alterman, on the briefs).

David M. Alberts argued the cause for respondent New Jersey Transit Police Department (McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys; John J. Peirano and David M. Alberts, of counsel and on the brief).

PER CURIAM

Appellant Stephen McGee. appeals from the September 6, 2022 final agency decision (FAD) of respondent New Jersey Transit Corporation (NJT), which terminated his employment for testing positive for a prohibited substance

under NJT's drug and alcohol policy following a random drug test. Based on our review of the record and the applicable legal principles, we affirm.

I.

McGee was a policer officer employed by the New Jersey Transit Police Department (NJTPD). He applied for the NJTPD in 2005 and attended the police academy. During his time with the NJTPD, he received commendations and awards for his service.

NJT is a public transportation agency. N.J.S.A. 27:25-2. In establishing NJT, the Legislature created a police department, NJTPD, for the purpose of providing "police and security responsibilities over all locations and services owned, operated, or managed by [NJT] and its subsidiaries." N.J.S.A. 27:25-15.1(a). NJT is subject to the rules and regulations of the Department of Transportation (DOT), the Federal Transit Administration (FTA), NJT Policy 3.25A § I, and the New Jersey Attorney General. NJT Policy 3.25A § X(c).

On May 29, 2019, McGee was selected for a random drug test in accordance with NJT's Policy 3.25A. Rosalind Evans-White, an NJT senior drug and alcohol testing technician, administered the test. Evans-White collected McGee's urine sample for testing to be completed by Quest Diagnostics (Quest). Specifically, (1) the specimen was collected in accordance

2

with DOT regulations; (2) the custody and control form was signed; (3) the sealing labels were initialed and signed by McGee attesting to the fact that he had no issue with the collection; and (4) the specimen was sealed in front of McGee and placed in a sealed transport bag. Evans-White placed the specimen in a Quest lockbox in a parking garage, where it remained for two days before it was transported to Quest for analysis.

Quest reported McGee's urine sample contained 51 ng/ml of a marijuana metabolite, tetrahydrocannabinol (THC), which exceeded the permitted threshold of 15 ng/ml.[1] As a result, McGee reported to a Medical Review Officer (MRO) to review the drug test results.

Drug test results are not considered "positive" under NJT's policy "until they are reviewed and verified by an MRO." NJT Policy 3.25A § XIII(J)(1). The MRO's review must include (1) verifying the chain of custody, (2) verifying the laboratory report and assessment of the test result was reasonable, (3) examining alternate explanations for a positive, substituted, adulterated, or

---

[1] McGee's sample was tested twice, consistent with the federal regulations and Policy 3.25A. If the primary specimen tests over 50 ng/ml, the laboratory utilizes gas chromatography/mass spectrometry to test the primary specimen again at a lower threshold of 15 ng/ml to confirm the results. Here, both tests showed a positive test result of 51 ng/ml.

A-0566-22

invalid result, and (4) giving the employee an opportunity to discuss the result with the MRO prior to verifying a positive result.

During the meeting with the MRO, Dr. Gita Dalao, McGee told Dr. Dalao that he had been using cannabidiol (CBD). Specifically, McGee advised Dr. Dalao that he used CBD infused topical cream, CBD ingestible droplets, and a CBD vape product. Dr. Dalao found no justification to excuse McGee's test result and upheld the positive test result.

NJT subsequently charged McGee with (1) using marijuana in violation of NJT Policy 3.25A; (2) using drugs in violation of NJTPD Rule 7.33; and (3) conduct unbecoming under NJTPD Rule 7.1. On June 4, 2019, McGee was placed on administrative suspension. On July 12, 2019, McGee entered a plea of not guilty, and the matter was subsequently transferred to the Office of Administrative Law (OAL) for a hearing before an Administrative Law Judge (ALJ). McGee was indefinitely suspended without pay pending the resolution of the matter in the OAL.

At the time of McGee's positive drug test, NJT had in place a drug and alcohol policy under NJT Policy 3.25A. The policy was designed to "ensure that [NJT] provides the safest possible transportation for the public and . . . promote[s] the safety and welfare of [its] employees . . . through the requirement

4

of a workplace and workforce free from the effects of prohibited drugs and alcohol." NJT Policy 3.25A was implemented pursuant to the Drug-Free Workplace Act of 1988, 41 U.S.C. §§ 8101-8106, and the Omnibus Transportation Employee Testing Act of 1991, 49 U.S.C. § 5331.

NJT Policy 3.25A established the procedures for NJT's drug and alcohol-free workplace program in accordance with the regulations and guidelines established by the United States DOT and FTA. See NJT Policy 3.25A § I. Specifically, this policy mandates urine drug testing, as is required by the FTA under 49 C.F.R. § 655, for all covered employees who perform safety-sensitive functions, as defined in 49 C.F.R. § 655.4. Ibid.

Under NJT Policy 3.25A, NJTPD police officers are considered covered employees because they perform safety-sensitive functions and, therefore, are prohibited under both NJT's policy and federal law from using products with a THC concentration greater than 0.3 percent. Specifically, NJT Policy 3.25A provides:

> A. Prohibited Behavior
>
> As a condition of employment, all [NJT] employees are prohibited from being impaired by or under the influence of a drug or alcohol while:
>
> - Subject to reporting for duty or on duty

- Acting in an official capacity on behalf of [NJT]
- Wearing a recognizable [NJT] . . . uniform
- Operating any [NJT] vehicle at any time
- Conducting business for or representing [NJT]

1. Covered employees may not use the following prohibited drugs, "marijuana, cocaine, opiates, phencyclidine, amphetamines, ecstasy, and/or any other drug for which an employer must test under 49 C.F.R. 655.21 as may be amended" at any time. . . . A covered employee may be randomly tested for prohibited drug use at any time while on duty.

Regarding the federal definition of marijuana at the time of the drug test, 21 U.S.C. § 802(16) stated:

(A) Subject to subparagraph (B), the term[] . . . "marijuana" mean[s] all parts of the plant Cannabis sativa L., . . . and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin.

(B) The term[] . . . "marijuana" do[es] not include—

(i) hemp, as defined in . . . [7 U.S.C. § 1639o].

Federal law, under 7 U.S.C. § 1639o(1), defines the excluded hemp as any part of "the plant Cannabis sativa L. . . . . including the seeds thereof and all derivatives, extracts, [and] cannabinoids . . . with a delta-9 [THC] concentration of not more than 0.3 percent on a dry weight basis."

6

Under NJT's policy, police officers are subject to random drug testing. The policy contains specific procedures for these tests and notes, "[a]ll testing under this policy . . . will be conducted in strict accordance with the DOT Procedures for Transportation Workplace Drug and Alcohol Testing Programs in 49 C.F.R. Part 40."

In the case of police officers, NJT's policy provides:

> [A]ny sworn law enforcement officer who produces a verified positive test result for illegal use of drug(s) will be dismissed from the agency and permanently barred from future law enforcement employment in New Jersey. Moreover, any sworn officer that tests positive will be reported to the Central Drug Registry maintained by the Division of State Police.
>
> [NJT Policy 3.25A § X(C).]

Even in the absence of a positive test, the policy mandates the termination of any law enforcement officer who uses illegal drugs:

> [NJT] does not offer [v]oluntary or [m]andatory [substance abuse assistance] to a police officer using illegal drugs. Any sworn [NJT] law enforcement officer who is determined to have used illegal drug(s), through his own admission, a drug test, or otherwise, must be dismissed.
>
> [NJT Policy 3.25A § XII(A)(2).]

NJT policies regarding over-the-counter (OTC) medications, "recognizes that the use of [OTC] medications may compromise an employee's ability to

7

function properly in [their] safety-sensitive position."  NJT Policy 3.25A §

VIII(D)(1).  Accordingly, employees are required to "exercise caution" when

using any such OTC medication.  Ibid.  NJT Policy 3.25A § VIII(D)(1) requires

the employee to:

> [c]omply with and obey any restrictions printed on the OTC medication[;] [u]se the medication according to the recommended dose[;] [c]onsult a physician or a pharmacist for possible interactions of the OTC medication with other medication being consumed[; and] [o]btain clearance for use of the OTC medication while performing safety-sensitive functions from the physician, pharmacist or Medical Services.

The hearing before the ALJ took place on several days between January

2020 and April 2020.  NJT presented Laura Wooding, NJT's Director of Medical

Services and the Drug and Alcohol Program.[2]  McGee testified on his own behalf

and also called Dr. William Sawyer, a forensic toxicologist, as a witness.[3]

---

[2] NJT also called Dr. Dalao; Evans-White; Lieutenant John Sullivan, NJTPD internal affairs unit; Daniel Martin, Quest's lead certifying scientist; and Daniel Rendene, a Quest lab technician.

[3] McGee also called several individuals as character witnesses:  NJTPD Officer Daniel Whartenby; Atlantic County Undersheriff Richard Komar; Atlantic County Sheriff Eric Scheffler; NJTPD Sergeant Greig Fallon; NJTPD Officer James Ludzieski; and Atlantic City Sergeant Jose Gonzales.  All of McGee's character witnesses testified they had never seen or heard McGee talk about using illegal drugs or marijuana and that he performed his duties in an exemplary fashion.

Wooding prepared two memoranda, dated April 4 and April 12, 2019, regarding drug and alcohol testing policies with respect to marijuana. The April 4 memorandum primarily addressed medical marijuana, noting its use was not an excusable reason to test positive for marijuana. The April 12 memorandum reiterated marijuana was a Schedule I controlled dangerous substance. Moreover, the April 12 memorandum, entitled "Safety Sensitive Employees and the use of Marijuana in ANY form," stated in pertinent part:

> Please note that marijuana remains a drug listed in Schedule I of the Controlled Substances Act. It remains unacceptable for any safety-sensitive employee subject to drug testing under the [DOT]'s drug testing regulations to use marijuana in ANY form (to include CBD oil). In an effort to be very clear, [NJT's MROs] will not verify a drug test as negative based upon information that a physician recommended that the employee use "medical marijuana" or CBD oils.

Wooding testified she did not forward these letters to individual employees but sent them to all management and supervisors through a distribution list. She was unaware of whether the people on the distribution list disseminated the memoranda to rank and file officers. She further testified that the memoranda were not policy but intended to clarify existing policy. She stated she wanted to make it clear in the April memoranda that someone could

9

"obtain CBD oil . . . legally, [but] if [they went] above the limit, the [MRO was] required to report that as a positive test."

Dr. Sawyer testified on McGee's behalf and was qualified as a forensic toxicology expert. He testified regarding the two expert reports he prepared in connection with the underlying matter. In addition to reviewing the Quest data, Dr. Sawyer reviewed the laboratory certificate report for the testing he ordered of the CBD products used by McGee

Dr. Sawyer's initial report stated, "[t]here [was] no basis to discredit the . . . Quest . . . [l]aboratory report" and that "there [was] no basis to . . . question the accuracy of the findings submitted by Quest . . . as no discrepancies . . . were found within the . . . laboratory data package." However, in his amended report and testimony, he opined the testing of McGee's urine specimen was "defective" because it was placed in a lockbox that was not temperature controlled, and therefore, Quest's positive test for THC was flawed. However, he only testified the high storage temperatures "could have" affected the sample. He also acknowledged there was no scientific literature to substantiate the impact of the collection procedure used here and the lack of refrigeration on McGee's sample.

Dr. Sawyer also testified that he had Elsohly Laboratories test the three CBD products McGee used to determine their THC content. He testified that

A-0566-22

Fountain of Health CBD measured at 0.23 percent, Resonance Farm CBD measured at 0.14 percent, and Canna Vape Oil measured at 1.1 percent, which is three times above the federal limit. He further opined that Canna Vape Oil was a defective product because it contained an illegal level of THC that was not disclosed in its certificate of analysis or advertised on the product label. The product also contained no warning that it could result in a positive test.

Regarding Quest's urinalysis, Dr. Sawyer testified that the range of error for ng/ml in the test result would be from 47 to 55, with a concentration less than 50 ng/ml being a negative result. As such, Dr. Sawyer opined that McGee's initial test at 51 ng/ml did not exceed the initial cutoff value of 50 ng/ml because of the range of error.

Dr. Sawyer acknowledged the Canna Vape Oil regularly used by McGee contained "illegal" levels of THC. Dr. Sawyer stated, "to [a] reasonable toxicological certainty based on the study [he reviewed, his] test data and [his] training and experience[,] that the THC measurements in the urine of . . . McGee arose specifically from his chronic use and accumulative use of CBD oil."

McGee testified he regularly used various forms of CBD for inflammation, injuries, and sleep-related issues. He further testified he knew the consumption of marijuana was prohibited as an NJTPD police officer, but

11

he did not believe he was using marijuana. Regarding the April memoranda issued by Wooding, McGee testified he had never seen them prior to his random test. He stated the first time he saw the memos was around June 7, 2019. He testified he would never have used CBD oil if he knew it could result in a positive THC test.

Following the hearing, the ALJ issued an initial decision finding the results of McGee's drug test were unreliable because NJT failed to establish by a preponderance of credible evidence that McGee was using marijuana because, based on Dr. Sawyer's expert opinion, McGee's THC level of 51 ng/ml was not consistent with someone who used marijuana. Additionally, the ALJ found McGee's positive test was attributable to his use of CBD oil products, and Quest's analysis measuring McGee's sample at 51 ng/ml was not sufficiently reliable, within a reasonable analytical toxicological certainty, to find the 50 ng/ml threshold was exceeded. Therefore, NJT failed to demonstrate McGee had used marijuana in violation of its drug policies. However, the ALJ concluded McGee did violate NJT Policy 3.25A by failing to notify the NJTPD he was using CBD products. Therefore, the ALJ recommended a ninety-day suspension without pay commencing in July 2019.

A-0566-22

The matter was returned to NJT for a final decision. On September 6, 2022, Police Chief Christopher Trucillo issued an FAD. He concluded McGee violated NJT Policy 3.25A and NJTPD Rules 7.33 and 7.1 for using a controlled dangerous substance. As discussed more fully below, the Police Chief concluded that McGee admittedly used a product on a regular basis that Dr. Sawyer conceded contained illegal levels of THC, tested positive for THC on a drug test administered in accordance with NJT policy and federal regulations, and used CBD oil products without seeking advice from NJT's medical professionals. The Police Chief further determined McGee's violation of NJT Policy 3.25A required his termination. He subsequently denied McGee's motion for reconsideration.

This appeal followed.

## II.

McGee argues that because NJT played the role of "judge, jury, and executioner," we must scrutinize the FAD with particularity. He further contends NJT improperly disregarded the ALJ's findings. He next asserts that federal policy neither required nor warranted his termination in this matter. McGee further argues he did not receive proper notice of the directive

prohibiting CBD oil. Lastly, he maintains the notion of progressive discipline is not served by imposing the ultimate sanction of removal in this case.

The scope of our review in agency decisions is narrow. Appellate courts review decisions "made by an administrative agency entrusted to apply and enforce a statutory scheme under an enhanced deferential standard." E. Bay Drywall, LLC v. Dep't of Lab. & Workforce Dev., 251 N.J. 477, 493 (2022) (citing Hargrove v. Sleepy's, LLC, 220 N.J. 289, 301-02 (2015)). That enhanced deference stems, in part, from "the executive function of administrative agencies . . . ." Mazza v. Bd. of Trs., Police & Firemen's Ret. Sys., 143 N.J. 22, 25 (1995).

"An agency's determination on the merits 'will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Saccone v. Bd. of Trs., Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). The reviewing court "does not substitute its judgment of the facts for that of an administrative agency." Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 587 (2001) (citing Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587 (1988)). Rather, the reviewing court "defer[s] to matters that lie within the special competence" of the administrative agency. Balagun v. N.J. Dep't of Corr., 361 N.J. Super. 199, 202 (App. Div. 2003). The party

14

challenging the administrative action bears the burden of making that showing. Lavezzi v. State, 219 N.J. 163, 171 (2014).

On appeal, the judicial role in reviewing an administrative action is generally limited to three inquiries:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;
>
> (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).]

"When an agency's decision meets those criteria, then a court owes substantial deference to the agency's expertise and superior knowledge of a particular field." In re Herrmann, 192 N.J. 19, 28 (2007). Furthermore, "[w]here there is substantial evidence in the record to support more than one regulatory conclusion, it is the agency's choice which governs." In re Adoption of Amends. to Ne., Upper Raritan, Sussex Cnty., 435 N.J. Super. 571, 583 (App. Div. 2014) (quoting Murray v. State Health Benefits Comm'n, 337 N.J. Super. 435, 442

15

(App. Div. 2001)).  "If the Appellate Division is satisfied after its review that the evidence and the inferences to be drawn therefrom support the agency head's decision, then it must affirm even if the court feels that it would have reached a different result itself."  Id. at 584 (quoting Clowes, 109 N.J. at 588).

We review an agency's disciplinary sanction under a similar deferential standard and only modify a sanction "when necessary to bring the agency's action into conformity with its delegated authority."  Herrmann, 192 N.J. at 28 (quoting In re Polk, 90 N.J. 550, 578 (1982)).  A reviewing court "has no power to act independently as an administrative tribunal or to substitute its judgment for that of the agency."  Ibid. (quoting Polk, 90 N.J. at 578).  When reviewing an agency's disciplinary action, we consider "whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness."  Id. at 28-29 (quoting Polk, 90 N.J. at 578).

## A.

McGee argues that proceedings at the "local level" are inherently arbitrary, and we should employ procedures similar to those used in civil service cases or under N.J.S.A. 40A:14-150 that allow de novo arbitration through the Public Employees Relations Commission or de novo review in the Superior Court.  He contends that the Police Chief of NJT should not oversee the charging

16

process and final decision in this matter. Alternatively, he asserts we should "scrutinize with particularity" the FAD in this matter.

We are unpersuaded by McGee's arguments. He has not provided any controlling authority for the proposition that we should utilize a special standard of review in the context of this matter. We previously held the "combination of investigative and adjudicative functions does not, without more, constitute a due process violation." Del Tufo v. J.N., 268 N.J. Super. 291, 300 (App. Div. 1993) (quoting Withrow v. Larkin, 421 U.S. 35, 58 (1975)). Rather, a court must determine if "special facts and circumstances [are] present in the case before it that the risk of unfairness is intolerably high." Withrow, 421 U.S. at 58. "[P]roof of actual bias is necessary to overturn administrative actions" when the agency serves in both prosecutorial and adjudicatory capacities. In re Petition for Rev. of Op. No. 583 of Advisory Comm. on Pro. Ethics, 107 N.J. 230, 236 (1987).

Pursuant to these principles, we reject the challenge, as there is no evidence of either unfairness or actual bias to question the process. Accordingly, we utilize the standard of review set forth above and decline McGee's invitation to use a different standard.

McGee argues there was no adequate basis provided by the Police Chief to modify the ALJ's factual findings and legal conclusions. More particularly, he argues the Police Chief's FAD did not provide a reasonable basis to disregard the ALJ's determinations regarding the evidence presented by Dr. Sawyer, the only expert in this matter.

Pursuant to N.J.S.A. 52:14B-10(c):

> In reviewing the decision of an administrative law judge, the agency head may reject or modify findings of fact, conclusions of law or interpretations of agency policy in the decision, but shall state clearly the reasons for doing so. The agency head may not reject or modify any findings of fact as to issues of credibility of lay witness testimony unless it is first determined from a review of the record that the findings are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record. In rejecting or modifying any findings of fact, the agency head shall state with particularity the reasons for rejecting the findings and shall make new or modified findings supported by sufficient, competent, and credible evidence in the record.

[(emphasis added).]

The Police Chief adopted the ALJ's credibility determinations but ultimately rejected Dr. Sawyer's testimony because it was not persuasive. Furthermore, the Police Chief rejected the ALJ's conclusions of law, finding that

McGee's admission of using CBD oil, which contained THC above the federal limit, was alone sufficient to warrant termination under NJT Policy 3.25A.

McGee contends that the FAD impermissibly distinguished the ALJ's findings with respect to Dr. Sawyer's credibility and persuasiveness. The difference between "credibility" and "persuasiveness" was recently discussed by the United States Supreme Court in Garland v. Ming Dai, 593 U.S. 357, 371-72 (2021). The Garland Court stated:

> Admittedly, credibility and persuasiveness are closely bound concepts, sometimes treated interchangeably, and the line between them doesn't have to be drawn the same way in every legal context. But the distinctions . . . aren't entirely unfamiliar either. Take an example. Suppose a plaintiff is doing her best to recount a car accident to prove her case for damages. She testifies earnestly that she thought the traffic light was green when she entered an intersection. The plaintiff says she was then broadsided by the defendant who was traveling on a cross street and ran a red light. Later in the proceedings, however, the defendant presents video footage and the testimony of other witnesses, all of which show that it was really the plaintiff who drove through a red light and the defendant who had the right of way. It's easy enough to imagine that a factfinder might not describe the plaintiff as lacking credibility— in the sense that she was lying . . .—yet find that her testimony on a key fact was outweighed by other evidence and thus unpersuasive or insufficient to prove the defendant's liability. It's not always the case that credibility equals factual accuracy, nor does it guarantee a legal victory.

19

Here, the Police Chief did not reject the ALJ's finding that Dr. Sawyer was credible.[4] Chief Trucillo adopted but modified the ALJ's factual findings. Specifically, he accepted the ALJ's credibility determinations of all witnesses except Dr. Sawyer's "to the extent it exceed[ed] a credibility determination . . . and [became] a finding regarding the persuasiveness of the testimony." Moreover, because Dr. Sawyer was an expert witness, as opposed to a lay witness, his testimony was not "subject to the constraints of N.J.S.A. 52:14B-10(c)." ZRB, LLC v. N.J. Dep't of Env't Prot., 403 N.J. Super. 531, 561 (App. Div. 2008).

The Police Chief concluded that Dr. Sawyer's testimony and report were not entitled to the weight assigned by the ALJ because the reliability of McGee's drug test was independently bolstered by other factors, including his admitted use of CBD oil (topically, orally, and inhaled through vape). Importantly, Dr. Sawyer confirmed the vaping product contained THC levels more than three times higher than permitted and, therefore, was an illegal product. The Police Chief found McGee's use of Canna Vape Oil was an illegal controlled substance under federal law, which was "of crucial importance" considering NJT is a

---

[4] The Police Chief adopted the findings of the ALJ to the extent supported by the record, given he was "in the best position to assess the live testimony and pass on the credibility of witnesses."

transportation agency subject to the DOT and FTA, and the drug testing procedures set forth in 49 C.F.R. Part 40. These facts, the Police Chief noted, were recounted in McGee and Dr. Sawyer's testimony but omitted from the ALJ's findings of fact. We determine the Police Chief had the prerogative to assign different weight to the evidence presented before the ALJ, as well as to reach different legal conclusions than the ALJ.

The Police Chief found the ALJ failed to: (a) provide any analysis of the federal regulation; (b) use the federal definition of marijuana or provide an analysis of the same; and (c) interpret 49 C.F.R. 40.149 correctly. He noted the ALJ incorrectly relied on the testimony of McGee's peers and friends to conclude he did not use marijuana. Regarding 49 C.F.R. 40.149, he found the federal regulation clearly provided that the MRO had "the sole authority to make medical determinations leading to a verified test."

The Police Chief further noted, "[i]t is irrelevant that McGee was not aware that the vape oil contained 1.1 percent THC and was considered an illegal controlled substance." He noted Policy 3.25A does not require knowledge of the violation, and McGee was required to "seek clearance when taking an [OTC] medication." Moreover, he determined it was not relevant that McGee was unaware of the memos issued by Wooding in April 2019 because "[a]t all

relevant times use of CBD oil above .3 percent THC was considered an illegal controlled substance under federal law."

Contrary to the ALJ, the Police Chief concluded McGee used an illegal controlled substance in violation of NJT Policy 3.25A, which was supported by: (1) McGee's testimony of using CBD oil that Dr. Sawyer found contained THC levels above the federal limit; (2) McGee's positive drug test for THC that was performed pursuant to federal guidelines; and (3) McGee used CBD oil products without seeking advice from NJT's Medical Department or other medical professional. He reiterated it was not relevant that McGee was unaware the CBD vape oil contained impermissible levels of THC and was an illegal controlled substance because he had an obligation to ensure he did not violate NJT Policy 3.25A, which does not require knowledge of the violation. Likewise, the Police Chief found McGee's lack of knowledge regarding the April 2019 memoranda irrelevant because they related to CBD products that were under the 0.3 percent federal THC limit, and CBD products above that threshold were always considered an illegal controlled substance.

Regarding Quest's testing of McGee's sample, Chief Trucillo found the ALJ erred in concluding that a positive THC test measured at 51 ng/ml was not sufficiently reliable. He noted McGee's primary specimen was twice tested

above both established thresholds under 49 C.F.R. 40.87. First, it was tested at 51 ng/ml, above the 50 ng/ml threshold, then it was tested to confirm a threshold above 15 ng/ml. Lastly, the MRO reviewed and verified the testing process and positive result. He noted that while the ALJ believed the positive test result was attributable to McGee's use of CBD oil, the ALJ failed to acknowledge—pursuant to the federal definition of marijuana—McGee used a product containing 1.1 percent THC that was an illegal controlled substance under federal law.

In sum, the Police Chief found McGee used an illegal controlled substance in violation of NJT's policies, promulgated pursuant to federal law, as evidenced by his own admission and a positive drug test. In reviewing the decision of the ALJ, the Police Chief rejected the ALJ's conclusions of law and interpretations of agency policy and also identified with particularity the reasons why he disagreed with the ALJ's analysis of the evidence. Accordingly, he concluded McGee used an illegal controlled substance in violation of NJT Policy 3.25A and NJTPD Rules 7.33 and 7.1. Regarding the sanction, he concluded that a positive test for using an illegal controlled substance required termination under NJT Policy 3.25A.

There was ample evidence in the record to support the Police Chief's FAD, and we find no error in his evaluation of the ALJ's findings of fact or conclusions of law. To the extent the FAD modified the ALJ's factual findings and legal conclusions, it was supported by the record and was not arbitrary, capricious, or unreasonable. Accordingly, we affirm the FAD's conclusion that McGee violated NJT Policy 3.25A and NJTPD Rules 7.33 and 7.1.

C.

McGee next argues his termination was not required or warranted by federal policy. He contends the CBD vaping product he used did not violate NJT policy or federal law because it was legally obtained, even though it contained an impermissible amount of THC. He asserts the use of CBD "in-and-of-itself" is not prohibited under federal law, and he was not aware the products he used were outside of the legal specifications for the product.

The Police Chief noted, in addressing McGee's motion for reconsideration, the violations at issue in this matter did not "require knowledge of a violation" or "intentional use." He further noted McGee's argument "conflates the use of CBD oil in general with the specific use of CBD oil in this case, where one product had a concentration of THC of 1.1 [percent], more than the 0.3 [percent] required to fall within the federal definition of marijuana."

24

Moreover, "McGee's use of CBD oils is not a legitimate medical explanation for a laboratory-confirmed marijuana positive result [and] McGee did not seek advice from the [NJT] Medical Department . . . ."

Given that the policies do not require knowledge or intentional use of a product containing elevated levels of THC, we discern no error in the Police Chief's decision. There is substantial support in the record for his decision, and McGee has not demonstrated that it was arbitrary or capricious.

D.

McGee next argues his due process rights were violated because he did not receive Wooding's April 2019 memoranda discussing the prohibition of using CBD oil until after he was tested. Accordingly, he asserts he did not have notice that the use of CBD oil was prohibited under the drug policy.

In addressing the due process issue, the Police Chief noted, "[i]t is irrelevant that McGee was not aware that the vape oil contained 1.1 percent THC and was considered an illegal controlled substance. As a [NJT] Police Office[r], in a safety sensitive position, McGee has the obligation to ensure he does not violate the drug policy." Again, as noted above, the Police Chief further stated, Policy 3.25A does not require knowledge of the violation and required McGee to seek clearance when taking an OTC medication. Moreover, he noted:

it is irrelevant that McGee was not aware of the April memos that detailed [NJT's] prohibition on use of CBD oil. This prohibition relates to CBD oil that is within the federal . . . limit. At all relevant times use of CBD oil above .3 percent THC was considered an illegal controlled substance under federal law.

In his reconsideration decision, the Police Chief further stated, "McGee is presumed to know the law, especially as a law enforcement officer, and [NJT] is not required to provide [him] notice of the federal marijuana laws."

We discern no error in the Police Chief's decision, and we agree it was not germane as to whether McGee received Wooding's memoranda before he was tested. Again, NJT Policy 3.25A clearly incorporates the federal definition of marijuana. Additionally, as Wooding noted, the memoranda were not policy but intended to clarify existing policy, and therefore, McGee's lack of notice regarding the same did not amount to a violation of procedural due process.

E.

McGee points to his relative lack of disciplinary history and commendations received while serving as an NJT police officer in arguing that the principles of progressive discipline require reversal of the termination penalty imposed by the FAD.

When imposing penalties, state agencies have long considered progressive discipline principles, which are based on the notion that "past misconduct can

26

be a factor in the determination of the appropriate penalty for present misconduct." Herrmann, 192 N.J. at 29. Progressive discipline has generally been applied in two ways: (1) to "support the imposition of a more severe penalty for a public employee who engages in habitual misconduct," Id. at 30; and (2) "to mitigate the penalty for a current offense." Id. at 32. Progressive discipline, however, need not "be applied in every disciplinary setting." Id. at 33. Rather, progressive discipline may be bypassed "when the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for continuation in the position, or when application of the principle would be contrary to the public interest." Ibid.

In reviewing an agency's disciplinary sanction, we use a deferential standard. On appeal, we ask "whether [the] punishment is 'so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness.'" Polk, 90 N.J. at 578 (quoting Pell v. Bd. of Educ. of Union Free Sch. Dist. No. 1, 34 N.Y. 2d 222 (1974)).

The Police Chief noted in its decision denying reconsideration that "Policy 3.25A states that a verified positive drug test is a dischargeable offense." In fact, the policy mandates discharge following a positive test. Specifically, the policy provides, "any sworn law enforcement officer who produces a verified

27

positive test result for illegal use of drug(s) will be dismissed from the agency and permanently barred from future law enforcement employment in New Jersey."

We are mindful that "courts should take care to not substitute their own views of whether a particular penalty is correct for those of the [entity] charged with making that decision." In re Carter, 191 N.J. 474, 486 (2007). In view of the policy requiring termination, we cannot say under the facts of this case that the punishment is so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's conscience, and we determine the decision to terminate McGee was not arbitrary or capricious.

To the extent we have not specifically addressed any of McGee's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0566-22